Matter of S.M.B. v D.R.B. (2007 NY Slip Op 52237(U))

[*1]

Matter of S.M.B. v D.R.B.

2007 NY Slip Op 52237(U) [17 Misc 3d 1132(A)]

Decided on November 23, 2007

Family Court, Onondaga County

Hanuszczak, J.

Published by New York State Law Reporting Bureau
pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on November 23, 2007

Family Court, Onondaga County
In the Matter of S.M.B.,
Petitioner
against
D.R.B., Respondent
F-00009-93/06A

William R. Bartholmae, Esq., for petitioner; Alderman & Alderman, Ralph G.
DeMasi, Esq., of counsel, for respondent; Patrick J. Haber, Esq., Law Guardian.

Michael L. Hanuszczak, J.
On November 24, 2006, the petitioner-father filed a petition seeking to vacate
the order of support as contained in the parties' Judgement of Divorce, dated March 23, 1992,
which incorporated and did not merge the parties' Opting Out Agreement, dated January 1, 1992.
The petition stated that the support provisions in the divorce decree were later amended by a
February 19, 1993 order which contained the parties' stipulation regarding child care. The father
alleged that the mother had engaged in a pattern of conduct which resulted in the alienation of
their son A. B. from him. A. was born on [redacted] 1989. At the initial Court appearance on
January 16, 2007, the Support Magistrate transferred the petition to a Family Court judge.
As background to the instant proceeding, the Court notes that on February 2, 2007, the father
filed a petition seeking to vacate the award of support for the parties' son B. B., date of birth
[redacted] 1987, alleging that B. was not living in Florida with his mother. On February 26,
2007, the mother cross-petitioned for an upward modification of the father's support obligation
for A. and B. She alleged that she has become unemployed since the time of the divorce and that
the needs of the children have increased. These matters were heard at trial by the Support
Magistrate, and on June 28, 2007, the Support Magistrate issued an order directing the father to
pay the sum of $233.00 per week to the mother as and for child support for A. and a percentage
of B's college costs. The Support Magistrate also dismissed the father's petition.
The father's instant petition concerning A. came before this Court on February 6, 2007, and
at that time the parties' attorneys sought an adjournment for the purpose of reaching an agreement
between the mother and the father with respect to visitation between A. and his father. On
February 27, 2007 the Court assigned a Law Guardian to represent A. On April 4, 2007, the
Court stayed the instant proceeding to permit the other support petitions to be resolved by the
Support Magistrate. At the Court appearance on June 26, 2007, the Court was informed that the
parties could not reach a resolution on the instant matter. A hearing was scheduled and testimony
[*2]was taken on August 8, 2007, September 20, 2007, and
October 12, 2007. The Court reserved its decision and granted the attorneys for the parties and
the Law Guardian an opportunity to file written closing statements with the Court.There was very
credible and reliable testimony by the father that the mother's actions have driven a permanent
wedge between A. and him. The father testified that the parties communicated regarding A's
welfare prior to the mother relocating to Florida in July, 2006 with A. However, he also testified
that the mother had denied him visitation with Andrew on more than one occasion before the
relocation due to disputes regarding extra child support payments. The father testified that at
about the same time that A. and his mother began residing with the mother's current husband R.
G., she stopped all communications with the father regarding A. At that time the mother changed
her address and telephone number and provided the father only with a Skaneateles, New York
post office box address through which to contact her.
The father testified that, prior to the mother's move to Florida, he had a loving
relationship with A. He testified that he agreed to the mother's relocation to Florida based on his
understanding that he would be allowed to continue liberal contact with A. He testified that A.
stayed with him for a few months so as to help facilitate the mother's relocation.
The father further testified that he attempted to obtain from the mother a plan for
visitation with A. once the mother moved to Florida, but that his inquiries went unanswered.
Subsequent to the relocation, the father was not provided with his son's address in Florida, even
though he made numerous requests for it. The father also stated that he could not visit his son as
he was not aware of his son's address. The father testified that he never received an address,
telephone number, or e-mail address from the mother. He testified that he received a letter from
the mother on March 27, 2006 acknowledging that she had received his previous letters but
telling him that any contact could be through the "USPS." The mother's letter, which was
received into evidence also demanded that the father send her the $350.00 a month that the father
had agreed to send her in addition to the child support amount ordered by the Court. The father
testified that he is not in arrears on child support as he has paid the Court-ordered child support,
which is taken out of his paycheck by an income deduction order.
The father also stated that when A. made a request on December 22, 2006, to come
visit his father in Central New York for Christmas, he could not book airline tickets as he did not
have his son's street address. The father requested that A. provide his street address, but the child
informed him that his mother told him not to give his father their Florida address. The father
testified that in February of 2007 he spoke with A. by telephone about visiting for the summer,
but his son called him a "psycho" and made negative comments about child support issues. The
father also testified that A. told him that he was not allowed to visit with his father because his
father was not paying child support and that his father does not care for him. The father testified
that he was informed by Mr. G. via telephone that he could not visit with A. until he drops the
"alienation claim," and that his son told him by telephone that he would not visit with his father
as long as he proceeded with his petition. The father testified that he has not seen A. since July,
2006.
The father stated that on September 17, 2007 A. informed him by telephone that he
planned to visit his older brother in Binghamton, New York over the Thanksgiving holiday and
that he would visit his father when his brother can bring him.
The mother testified in person on one occasion and, with the consent of the Court,
testified by telephone on other hearing dates. The mother stated that she never made [*3]arrangements for A. to visit with his father, but instead relied on A.
to make plans and arrangements for visitation with his father in New York. She stated that she
will not contact the father to set up visitation because "the children are old enough." She testified
that she refused to divulge to the father her physical whereabouts in Florida and provided him
instead with the post office box address so that the parties could communicate exclusively
through the mail. However, she also testified that from December, 2005 to the present she would
not respond to the father's attempts to contact her by mail to discuss matters regarding their son.
The mother testified that she did inform A. that the father was not paying child
support. She also testified that she told A. that his father had sent a letter that "only a psycho
would send." The mother stated that she further informed A. that she and Mr. G. had taken the
envelope to the FBI to have the letter tested for fingerprints, and that the fingerprints on the
envelope allegedly matched the father's. On cross-examination, the mother denied that such a test
ever occurred.
The mother also testified that she and Mr. G. spoke to A. about the pending litigation
and her contentions concerning the father's child support payments. She stated that she asked the
father for extra money and that, when he refused, she told A. that his father is not paying support
and that he should not see his father. The mother testified that she was aware that Mr. G. left a
message on the father's answering machine indicating that unless the father withdrew his parental
alienation petition that he could not see A. She stated that she is afraid of the father and that is
why she withheld her address from him. She also stated that A. is the one who tells her that he
does not want to visit his father as he has "important things to do."
The Court finds the mother's testimony to be somewhat credible but she continually
exhibited her strong bias against the father. The Court also found her to be defensive and
argumentative.
The Law Guardian submitted two closing statements in writing to the Court. In the
October 29, 2007 submission, the Law Guardian stated that it has been sixteen months since his
client saw his father, that his client wanted to see his father, but that his client placed "restrictions
and limitations on the proposed visitation periods." The Law Guardian also stated that the mother
was the direct cause of the cessation of visitation as she ceased all communication with the
father, moved to Florida with the child, and provided no assistance in setting up visitation
between the child and his father.
On November 15, 2007, the Law Guardian transmitted an updated closing statement
to the Court in which he stated that his client wanted the Court to know that he is "not really
interested in seeing his father" and that he blames his father for the cessation of visitation. His
client also informed the Law Guardian that his mother paid for a plane ticket so that he could
travel to New York State to visit with his father over the Thanksgiving holiday.
In his written closing statement, the attorney for the father argued that the evidence
at trial shows that the mother engaged in a systematic pattern of destroying the father's
relationship with their son. He stated that it was uncontroverted that the mother moved to
Florida, refused to give the father any contact information in Florida, and stated that it was their
teen-aged child's responsibility to arrange for visitation with his father. The attorney pointed out
that the mother testified that she and their son had traveled to the Central New York region
following the move to Florida, but she did not inform the father or arrange for any visitation then
or at a later date in spite of repeated requests by the father to the mother at her Central New York
Post Office box. He also stated that there is ample testimony showing that the mother made many
demeaning [*4]statements to their son about his father.
It is a matter of fundamental policy that the parents of an unemancipated child are
responsible for the support of that child until the child turns 21 years of age (Fam. Ct. Act § 413 (1)(a).) However, where it can be
established by the noncustodial parent that the custodial parent has unjustifiably frustrated the
noncustodial parent's right of reasonable access and that the child is not in danger of becoming a
public charge, child support payments may be suspended or vacated. (See Usack v. Usack 17 AD3d 736;
Kershaw v. Kershaw, 268 AD2d 829; Hiross v. Hiross, 224 AD2d 662; Hecht
v. Hecht, 222 AD2d 589.)
As a preliminary matter, the Court notes that the testimony does not support a claim for
constructive emancipation of the subject child as he is not of an age to be self-supporting.
The Court finds that the testimony established that the mother has engaged in a
pattern of active interference and deliberate frustration of A's relationship with his father. The
Court found the Petitioner's testimony regarding his attempts to arrange visitation with A. to be
very credible, reliable, and made in good faith. However, it was clear to this Court that the
mother chose to manifest her disdain for the father through a deliberate and systematic campaign
to alienate A. from his father. The mother's testimony shows that she is very angry that the father
pays no more child support than what has been ordered by the Court. Since her move to Florida
and her remarriage, she has withheld access to A. due to this anger with the father. She has also
made repeated, inflammatory remarks to A. about his father's refusal to pay extra support.
The mother's acts of alienation were not isolated incidents but rather a continuing
pattern that began before she relocated to Florida with the subject child and began residing with
her new husband. Subsequently, her actions escalated to complete non-access after the move. The
mother's rancorous testimony towards the father at trial leads this Court to conclude that her
actions in regards to her son's visitation with his father amounted to a willful denial and
interference with the father's visitation rights.
It is unfortunate that this mother has succeeded in her endeavors; A. shows no
interest in having a relationship with his father. A's position is made only too clear by his
insistence that the Law Guardian correct any impression that the Law Guardian may have given
this Court that he would like to see his father.
Vacatur of a support order is not a measure to be taken lightly by any Court.
However, after hearing the testimony in this case, this Court has no doubt that the mother's
parenting relationship with the father will not undergo any change for the better. There is also no
indication to this Court that A. will change his mind about a relationship with his father, in spite
of the mother's calculated attempt during the pendency of this proceeding to arrange for A. to
visit New York over the Thanksgiving holiday. Furthermore, no evidence was presented at trial
indicating that A. will become a public charge if the order of support is vacated.
Therefore, this Court finds based upon the testimony and the credible evidence
before it that the father has met his burden of proof on the issue of alienation, establishing that
the mother unjustifiably frustrated his right of reasonable access to the subject child. (Colicci v. Ruhm, 20 AD3d 891,
citing Smith v. Bombard, 294 AD2d 673; Kershaw v. Kershaw, 268 AD2d 829.)
The Court also finds that A's relationship with his father has been poisoned to the degree that no
reconciliation between them is likely. Accordingly, the father's support obligation with respect to
A. is vacated, effective November 23, 2007.
The father's attorney is directed to submit the proposed order in accordance with this
Decision on notice to the attorneys, as well as his application for attorney's fees and costs.
[*5]